**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MONTY MARCH, on Behalf of Himself and All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| REAL ESTATE BOARD OF NEW YORK; REAL ESTATE BOARD OF NEW YORK LISTING SERVICE; BROWN HARRIS STEVENS, LLC; CHRISTIE'S INTERNATIONAL REAL ESTATE LLC; COLDWELL BANKER LLC; COMPASS, INC.; CORE MARKETING SERVICES LLC; THE CORCORAN GROUP, INC.; DOUGLAS ELLIMAN, INC.; ELEGRAN REAL ESTATE, d/b/a ELEGRAN LLC; ENGEL & VOLKERS LLC; FOX RESIDENTIAL GROUP LLC;  HALSTEAD REAL ESTATE LLC; HOMESNAP INC.; KELLER WILLIAMS NYC, LLC; LESLIE J. GARFIELD & CO., INC.; LEVEL GROUP INC.; M.N.S. REAL ESTATE NYC, LLC; MODERN SPACES LLC; THE AGENCY LLC; THE MODLIN GROUP LLC; NEST SEEKERS INTERNATIONAL LLC; OXFORD PROPERTY GROUP LLC; R NEW YORK LLC; RE/MAX, LLC; SERHANT LLC; SLOANE SQUARE LLC; and SOTHEBY'S INTERNATIONAL REALTY AFFILIATES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

THE PARTIES......................................................................................................................5

REBNY DEFENDANTS .......................................................................................................6

MANHATTAN RESIDENTIAL REAL ESTATE BROKERAGE  AND LISTING
SERVICE DEFENDANTS......................................................................................................7

JURISDICTION AND VENUE ...............................................................................................7

FACTUAL ALLEGATIONS ..................................................................................................12

   I.    BACKGROUND ON RESIDENTIAL REAL ESTATE TRANSACTIONS...................12

   II.    MULTIPLE LISTING SERVICES ...................................................................20

   III.  CURRENT LITIGATION CONCERNING THE NAR'S BUYER BROKER
         COMMISSION RULE........................................................................................21

       A.     The Missouri Action .................................................................. 23

       B.     The Illinois Action .................................................................... 24

       C.     The Massachusetts Action ......................................................... 24

SUBSEQUENT RULE CHANGES .........................................................................................25

RELEVANT MARKET AND DEFENDANTS' MARKET POWER .................................................27

TIMELINESS AND DEFENDANTS' CONTINUING VIOLATION ...............................................28

ANTI-COMPETITIVE EFFECTS ..........................................................................................29

ANTITRUST INJURY ........................................................................................................30

CLAIMS FOR RELIEF ......................................................................................................32

PRAYER FOR RELIEF ......................................................................................................37

JURY TRIAL DEMAND .....................................................................................................39

B

Plaintiff Monty March, on behalf of himself and all others similarly situated, bring this antitrust class action against the following: Real Estate Board of New York ("REBNY"); REBNY Listing Service; Brown Harris Stevens, LLC; Christie's International Real Estate LLC; Compass, Inc.; Coldwell Banker LLC; Core Marketing Services LLC; The Corcoran Group, Inc; Douglas Elliman, Inc.; Elegran Real Estate d/b/a Elegran LLC; Engel & Volkers LLC; Fox Residential Group LLC; Halstead Real Estate LLC; Homesnap Inc.; Keller Williams NYC, LLC; Leslie J. Garfield & Co. Inc.; Level Group Inc.; M.N.S. Real Estate NYC, LLC; Modern Spaces LLC; The Agency LLC; The Modlin Group LLC; Nest Seekers International LLC; Oxford Property Group LLC; R New York LLC; RE/MAX, LLC; Serhant LLC; Sloane Square LLC; and Sotheby's International Realty Affiliates LLC (together "Defendants") for violations of federal antitrust, state antitrust and unjust enrichment laws.  Based upon information and belief, and the investigation of counsel, Plaintiff alleges as follows.

## INTRODUCTION

1.      This is an antitrust class action seeking damages and injunctive relief for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1; New York state antitrust (New York General Business Law § 340); and unjust enrichment law against REBNY, REBNY Residential Listing Service ("REBNY Listing Service") and various Manhattan residential real estate brokerage firms.

2.      Plaintiff, an individual who listed and sold Manhattan residential real estate pursuant to REBNY and the REBNY Listing Service Universal Co-Brokerage Agreement/Rules and Regulations ("REBNY Listing Service rules"), was forced to pay artificially inflated commissions in violation of Section 1 of the Sherman Act and New York state antitrust and unjust enrichment laws. Plaintiff brings this action on behalf of himself, and all other similarly situated sellers, who sold residential real estate in Manhattan and were forced to pay a Buyer Broker's

commission in accordance with the REBNY Listing Service rules from November 8, 2019 until the present (the "Class Period").

3.      Residential real estate brokers are compensated through the payment of a commission which is calculated as a percentage of a property's sale price. Any individual who lists and sells Manhattan residential real estate ("Seller") is generally required to pay a commission fee to the Seller Broker and the Buyer Broker under REBNY Listing Service rules.  REBNY, REBNY Listing Service, and their affiliates require that the commission paid to the Seller Broker be shared equally with the real estate purchaser's ("Buyer") broker.

4.      Manhattan is one of the largest and most expensive residential real estate markets in the world.  For example, in 2018, approximately $21.8 billion in residential real estate transactions occurred in Manhattan.[1]  In the first quarter of 2022, Manhattan real estate sales topped $7 billion.[2]  At the same time, the average price of a Manhattan apartment increased a staggering 19% over the previous year's period, to $2,042,113.[3]

5.      For more than 125 years, REBNY has been the trade association for residential real estate brokers, agents, building owners, managers, and developers for Manhattan.[4]  REBNY members include approximately 810 brokerage firms and 15,000 real estate professionals.

---

[1]      *City Realty 2019 Manhattan Year-End Market Report*, CITYREALTY at 3 (Dec. 2019), https://www.cityrealty.com/nyc/market-insight/market-reports-research/annual-market-reports/cityrealty-2019-manhattan-year-end-report/38801.  This number does not include townhouse and mansion sales.

[2.]      Robert Frank, *Manhattan Residential Real Estate Sales Hit a Record $7.3 Billion in the First Quarter,* CNBC (APR. 5, 2022), https://www.cnbc.com/2022/04/05/manhattan-residential-real-estate-sales-hit-record-7point3-billion-in-first-quarter.html.

[3]      *Id*.

[4]      *About REBNY*, REBNY REAL ESTATE BOARD OF NEW YORK (© 2023) https://www.rebny.com/about/.

2

6.     REBNY Listing Service is a comprehensive Manhattan residential real estate listing service that provides information to REBNY brokerage firms that are members of REBNY's Residential Brokerage Division.  Only REBNY registered brokers can access the online portal that has property and listing information for Manhattan residential real estate currently for sale.

7.     REBNY Listing Service requires brokers and agents to acknowledge and agree, in writing, "to abide by the terms and conditions set forth in the RLS [REBNY Listing Service] Universal Co-Brokerage Agreement/Rules and Regulations" including the provisions contained in Article IV.  *See* Exhibit A (attached hereto) at 2.

8.     Article IV of the REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations establishes mandatory rules which members must adhere to concerning compensation.  Article IV (COMPENSATION, Section 1. *Commission*) requires a Seller Broker to equally share the commission established in the Listing Agreement with a Buyer Broker.  The relevant provision of Article IV, Section 1 Commissions is as follows:

> With respect to the sale of an Exclusive Property, if a sale is consummated with a Buyer procured by a Co-Broker, unless the Exclusive Listing specifies otherwise or absent some other written agreement between an Owner and their Exclusive Broker(s), *the Exclusive Broker and the Co-Broker shall each be paid an equal share of the commission as specified in the Exclusive Listing*.

(Emphasis added).

9.     In order to list a property for sale on the REBNY Listing Service, REBNY Listing Service rules specifically require the Seller to make a non-negotiable offer of compensation (as a commission) to the Buyer Broker when listing Manhattan residential real estate for sale and to pay the Buyer Broker's commission. *Id*.  This is commonly known as the "Buyer Broker Commission Rule."  This rule forces a Seller to pay the Buyer Broker's commission, eliminates negotiation of the Buyer Broker's compensation, artificially inflates the Buyer Broker's commission, and

substantially increases the transaction cost of the Seller.  Put differently, under the REBNY Listing Service rules, if a Buyer, represented by a Buyer Broker, purchases residential real estate, with limited exception, the Buyer Broker would be entitled to receive the offered compensation paid for by the Seller as outlined in the listing agreement.

10.     The Buyer Broker Commission Rule fosters an environment in which a Buyer Broker and a Seller Broker ***work cooperatively to split*** a total commission instead of openly and separately competing to earn the business of their respective residential real estate Sellers and residential real estate Buyers.

11.     In a fully competitive market, a Seller would negotiate and pay a commission or fee to her or his own broker and a commission to the Buyer Broker would be separately negotiated and paid.  Indeed, this is occurring in Brooklyn, New York where the multiple listing service no longer has a mandatory Buyer Broker Commission Rule. There, average Buyer Broker's commissions are approximately 1%.

12.     By virtue of the REBNY Listing Service Buyer Broker Commission Rule, REBNY, Defendants, and their agents, have entered into an unlawful agreement and/or conspiracy to fix, raise, maintain, or stabilize Manhattan residential real estate commissions in restraint of trade, violating Section 1 of the Sherman Act, 15 U.S.C. §1, New York state antitrust (GBL §340), and unjust enrichment law.

13.     The enactment and enforcement of the REBNY Listing Service's Buyer Broker Commission Rule increases a Seller's transaction cost, and artificially inflates Manhattan residential real estate broker commissions paid by residential real estate Sellers.  Without this mandatory rule, a Seller *would not* be forced to compensate a Buyer Broker, who should have a duty of loyalty only to the Buyer, not the Seller, and acting free of a conflict of interest seeks to

drive a Seller's price down in Manhattan residential real estate transactions.  But-for the REBNY Listing Service Buyer Broker Commission Rule, the Buyer Broker's commission would (if necessary) be negotiated and paid separately.

14.     Defendants' unlawful agreement(s) concerning Buyer Broker's commissions in Manhattan residential real estate transactions have had the following anticompetitive effects:

    i.    Manhattan residential real estate Sellers have been forced to pay commissions to Buyer Brokers – who represent their adversaries in negotiations to sell their homes – thereby substantially increasing the Seller's transaction cost;

    ii.    Manhattan Sellers have paid artificially inflated commissions, including Buyer-Broker's commissions;

    iii.    The Buyer Broker Commission Rule has fixed, raised, maintained, or stabilized supra-competitive residential real estate commission rates in Manhattan; and

    iv.    Price competition among Manhattan residential real estate brokers seeking to be retained by Buyers has been restrained, as has price competition among brokers seeking to be retained by Sellers.

15.     As a direct and proximate result of Defendants' unlawful agreement(s), Plaintiff and Class members have been injured in their business and property by paying supra-competitive Buyer Broker's commissions.

## THE PARTIES

16.     Plaintiff Monty March ("Plaintiff") resides in the State of New York and owned residential real estate on the Upper East Side of Manhattan ("Property"). On or about September 22, 2021, Plaintiff entered into a Listing Agreement with Defendant Brown Harris Stevens, LLC concerning the sale of the Property.  The Property was listed for sale by Defendant Brown Harris Stevens, LLC in accordance with a Listing Agreement, REBNY rules and/or REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations. Paragraph 6 of the Listing Agreement required Plaintiff to authorize Defendant Brown Harris Stevens, LLC to "solicit the cooperation of other licensed real estate brokers who are members of The Real Estate Board of

New York (REBNY) who will act as agents for the prospective purchasers, and work with them on a cooperating basis. In order to prepare the property for sale, the solicitation of REBNY members will take place simultaneously with any showing, web site placement or advertising of the property. In the event another licensed real estate broker is involved with the transaction, *we will split the commission with such broker* and in no event will the commission paid by you exceed five percent of the sale price." (emphasis added). As a part of the 2022 sales transaction, the Plaintiff paid a substantial commission to the Buyer's Broker in accordance with the Listing Agreement and Article IV, Section 1 of the REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations. As a direct and proximate result, Plaintiff was injured in his business and/or property.

## REBNY DEFENDANTS

17.     Defendant, Real Estate Board of New York ("REBNY"), is a private, not-for-profit corporate trade association comprised of a vast majority of New York's real estate agents and brokerages. REBNY is headquartered at 570 Lexington Avenue, 2nd Floor, New York, New York 10022. REBNY's membership includes brokerages and residential real estate brokers, building owners, managers, and developers in the New York Residential Real Estate Brokerage Market and agents operating in the New York Residential Real Estate Market. REBNY members include 810 brokerage firms and 15,000 real estate professionals.

18.     Defendant Real Estate Board of New York Listing Service ("REBNY Listing Service") is a *de facto* multiple listing service that provides the most comprehensive and up to date exclusive residential real estate sale listings in Manhattan. REBNY Listing Service is headquartered at 505 Park Avenue, New York, New York 10022.

## MANHATTAN RESIDENTIAL REAL ESTATE BROKERAGE
## AND LISTING SERVICE DEFENDANTS

19.     Defendant, Brown Harris Stevens LLC, is a real estate brokerage firm headquartered at 770 Lexington Avenue, 4th Floor, New York, New York 10065.   Upon information and belief, Brown Harris Stevens is a REBNY member and a member of the REBNY Listing Service.

20.     Defendant, Christie's International Real Estate LLC ("Christie's"), is a real estate brokerage firm whose primary New York location can be found at One Rockefeller Plaza, Suite 2402, New York, New York 10020.  Upon information and belief, Christie's is a REBNY member and a member of the REBNY Listing Service.

21.     Defendant, Coldwell Banker LLC ("Coldwell Banker") is a real estate brokerage firm whose primary New York location can be found at 1430 Broadway, 9th Floor, New York, New York 10018. Upon information and belief, Coldwell Banker is a REBNY member and a member of the REBNY Listing Service.

22.     Defendant, Compass, Inc. ("Compass"), is a real estate brokerage firm headquartered at 90 Fifth Avenue, 3rd Floor, New York, New York 10011.  Upon information and belief, Compass is a REBNY member and a member of the REBNY Listing Service.

23.     Defendant, Core Marketing Services LLC ("CORE"), is a real estate brokerage firm headquartered at 149 Fifth Ave, 11th Floor, New York, New York 10010.  Upon information and belief, CORE is a REBNY member and a member of the REBNY Listing Service.

24.     Defendant, The Corcoran Group, Inc., ("Corcoran"), is a real estate brokerage firm headquartered in New York City at 590 Madison Avenue, 8th Floor, New York, New York 10022. Upon information and belief, Corcoran is a REBNY member and a member of the REBNY Listing Service.

25.     Defendant, Douglas Elliman, Inc. ("Douglas Elliman"), is a real estate brokerage firm headquartered at 575 Madison Avenue, 3rd Floor, New York, New York 10022.   Upon information and belief, Douglas Elliman is a REBNY member and a member of the REBNY Listing Service.

26.     Defendant, Elegran Real Estate d/b/a Elegran LLC ("Elegran"), is a real estate brokerage firm headquartered at 1407 Broadway, 26th Floor, New York, New York 10018.   Upon information and belief, Elegran is a REBNY member and a member of the REBNY Listing Service.

27.     Defendant, Engel & Volkers LLC ("Engel & Volkers") is a real estate brokerage firm whose primary New York location can be found at 430 Park Avenue, 11th Floor, New York, New York 10022. Upon information and belief, Engel & Volkers is a REBNY member and a member of the REBNY Listing Service.

28.     Defendant, Fox Residential Group LLC ("Fox") is a real estate brokerage firm headquartered at 14 East 60th Street #500, New York, New York 10022. Upon information and belief, Fox is a REBNY member and a member of the REBNY Listing Service.

29.     Defendant, Halstead Real Estate LLC ("Halstead"), is a real estate brokerage firm headquartered at 499 Park Avenue, 14th Floor, New York, New York 10153.   Upon information and belief, Halstead is a REBNY member and a member of the REBNY Listing Service.

30.     Defendant, HomeSnap Inc. owns Citysnap, a multiple listing service search portal and app that provided consumers with sales and rental listings directly from REBNY's Residential Listing Service.   On May 24, 2021, CoStar Group completed their $250 million acquisition of Homesnap Inc.  Now, Citysnap is a joint venture between REBNY and CoStar Group.  Citysnap provides real-time access to residential listings from a list of 550 firms and nearly 13,000 real

estate agents who represent over 27,000 sales and rental listings across New York City. Homesnap, Inc. is headquartered at 1331 L St NW Washington, DC 20005. Homesnap's Citysnap operations are located at 570 Lexington Avenue, New York, New York, 10022.

31.     Defendant, Keller Williams NYC LLC ("KWNYC"), is a real estate brokerage firm headquartered at 99 Park Avenue, 10th Floor, New York, New York 10016. Upon information and belief, KWNYC is a REBNY member and a member of the REBNY Listing Service.

32.     Defendant, Leslie J. Garfield & Co. Inc. ("Leslie J. Garfield"), is a real estate brokerage firm headquartered at 505 Park Avenue, Suite 303, New York, New York 10153. Upon information and belief, Leslie J. Garfield is a REBNY member and a member of the REBNY Listing Service.

33.     Defendant, Level Group Inc., ("Level Group"), is a real estate brokerage firm headquartered at 5 West 37th Street, 12th Floor, New York, New York 10018. Upon information and belief, Level Group is a REBNY member and a member of the REBNY Listing Service.

34.     Defendant, M.N.S. Real Estate NYC ("M.N.S"), LLC is a real estate broker firm headquartered at 40 North 6th Street, Brooklyn, New York 11211. Upon information and belief, M.N.S. is a REBNY member and a member of the REBNY Listing Service.

35.     Defendant, Modern Spaces, LLC ("Modern Spaces") is a real estate brokerage firm headquartered at 10-27 46th Avenue, Floor 4, Long Island City, New York 11101. Upon information and belief, Modern Spaces is a REBNY member and a member of the REBNY Listing Service.

36.     Defendant, The Agency LLC ("The Agency"), is a real estate brokerage firm whose primary New York address can be found at 88 University Place, 3rd Floor, New York, New York

10003.  Upon information and belief, The Agency is a REBNY member and a member of the REBNY Listing Service.

37.     Defendant, The Modlin Group LLC ("The Modlin Group"), is a real estate brokerage firm headquartered at 152 West 57th Street, 18th Floor, New York, New York 10019. Upon information and belief, The Modlin Group is a REBNY member and a member of the REBNY Listing Service.

38.     Defendant, Nest Seekers International LLC ("Nest"), is a real estate brokerage firm headquartered at 505 Park Avenue, New York, New York 10022.  Upon information and belief, Nest is a REBNY member and a member of the REBNY Listing Service.

39.     Defendant, Oxford Property Group ("Oxford"), is a real estate brokerage firm headquartered at 5 West 37th Street, 12th Floor, New York, NY 10018.  Upon information and belief, Oxford is a REBNY member and a member of the REBNY Listing Service.

40.     Defendant, R New York LLC, is a real estate brokerage firm headquartered at 641 Lexington Avenue, 22nd Floor, New York, New York 10022.  Upon information and belief, R New York is a REBNY member and a member of the REBNY Listing Service.

41.     Defendant, RE/MAX, LLC, is a real estate brokerage firm whose New York office can be found at 257 Park Avenue South, 8th Floor, New York, New York 10010.  Upon information and belief, RE/MAX, LLC is a REBNY member and a member of the REBNY Listing Service.

42.     Defendant, Serhant LLC ("Serhant"), is a real estate brokerage firm headquartered at 372 West Broadway, New York, New York 10012.  Upon information and belief, Serhant is a REBNY member and a member of the REBNY Listing Service.

43.     Defendant, Sloane Square LLC ("Sloane Square"), is a real estate brokerage firm headquartered at 25 East 67th Street, Suite 8D, New York, New York 10021. Upon information and belief, Sloane Square is a REBNY member and a member of the REBNY Listing Service.

44.     Defendant, Sotheby's International Realty Affiliates LLC ("Sotheby's"), is a real estate brokerage firm headquartered at 650 Madison Avenue, 2nd Floor, New York, New York 10153.  Upon information and belief, Sotheby's is a REBNY member and a member of the REBNY Listing Service.

**JURISDICTION AND VENUE**

45.     Defendants transact substantial business including the extensive business operations of each of their real estate brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a significant portion of residential real estate listings and sales on the REBNY Listing Service in this District.

46.     Defendants have received millions of dollars in revenue, unlawfully obtained through the implementation of and adherence to REBNY and/or REBNY Listing Service rules in this District; their brokerage operations; and the operations of their respective agents that transact residential real estate business in this District.

47.     The anti-competitive rules, policies, and practices alleged in this Complaint violate both the Sherman Act (15 U.S.C. §1) and New York's Donnelly Act (N.Y. Gen. Bus. Law §340) and negatively affect residential real estate Sellers transacting residential real estate business through the REBNY Listing Service in Manhattan.  The REBNY Listing Service's Buyer Broker Commission Rule and other anti-competitive rules have routinely been adopted, applied, and enforced in this District for the relevant period and have been implemented by each Defendant. These rules govern the conduct of local residential real estate brokers and local residential real estate sales agents conducting business on the REBNY Listing Service and in this District.

Defendants conduct interstate commerce as they represent out-of-state buyers and sellers in residential real estate transactions concerning residential real estate located in Manhattan.

48.     In addition to personal jurisdiction existing based upon the federal Sherman Act allegations, this Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the putative Class contains thousands of persons or entities, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a State different from the Defendants.

49.     This Court has personal jurisdiction over Defendants which: (i) transacted substantial business in this District; (ii) transacted business with members of the Class in this District; (iii) had substantial presence and contacts in this District; and (iv) committed unlawful acts in furtherance of their scheme in this District.

50.     Venue is proper in this District under 15 U.S.C. §22 and under 28 U.S.C. §1391(b), (c), and (d).  Each Defendant transacted business, can be found, or had offices and/or agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected trade and commerce described herein has been carried out in this District.

## **FACTUAL ALLEGATIONS**

## I.     **BACKGROUND ON RESIDENTIAL REAL ESTATE TRANSACTIONS**

51.     Manhattan is one of the most expensive residential real estate markets in the world.

52.     Residential real estate transactions in the United States and Manhattan typically occur between a homeowner selling a property ("Seller") and a person who is buying residential real estate ("Buyer").

53.     Manhattan residential real estate Sellers and Buyers are usually represented by individuals who are licensed by the State of New York.  There are two licensee categories: (i) the

real estate broker (also known as a "brokerage firm"); and (ii) the individual real estate licensee or agent.  Brokers and brokerages, as sponsors, are legally responsible for the actions of their licensed realtors or agents.

54.    Only a licensed broker is permitted under New York state law to be paid to represent a Seller or a Buyer in a residential real estate transaction.  Residential real estate brokerage contracts with sellers and buyers are with brokers, not agents, for this reason, and all payments to individual realtors or agents pass through brokers.  The vast majority of real estate Sellers and Buyers in Manhattan and across the country utilize a broker to assist in a real estate transaction.[5]

55.    In a typical residential real estate transaction, the Seller retains her or his own broker and a residential real estate Buyer typically retains her or his own broker.

56.    The common practice in the New York real estate industry is to refer to a "buyer's broker" as an agent that exclusively represents buyers.  Similarly, the common parlance in New York uses the term "listing broker" as a broker representing the seller in a transaction who lists the property for sale on a multi-listing service; and the term "seller broker" for a broker representing the Seller in a real estate transaction.  As used throughout this Complaint, a "Buyer Broker" simply means a broker who represents a purchaser in a typical residential real estate sale and does not mean that the buyer's real estate agent exclusively represents buyers in residential real estate transactions.  Likewise, the term "Seller Broker," as used throughout this Complaint, simply means the real estate broker who is representing the residential real estate Seller.

---

[5]    In 2022 in the U.S., 86% of Buyers purchased their home through a real estate agent and 86% of Sellers sold their home with assistance from a real estate agent.  *Quick Real Estate Statistics*, NAT'L ASS'N OF REALTORS (July 12, 2023), https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics.

57.     Seller Brokers and Buyer Brokers are compensated through the payment of a commission which is calculated as a percentage of a property's sale price.  The Seller Broker's commission is typically established in a listing agreement, which is a contract between the Seller and the Seller's Broker.  The listing agreement contains the listing terms, defining the scope of the agreement the Seller's Broker has with the Seller, such as the exclusive right to market the Seller's home for a defined period of time.

58.     Under REBNY Listing Service rules, the listing agreement also specifies the total commission that a residential real estate Seller is required to pay to the Seller Broker if a transaction is consummated or a ready, willing, and able Buyer is presented.  The listing agreement further specifies that the Buyer Broker, if one is retained, is to be compensated from the commission paid by the Seller to the Seller Broker.

59.     To be sure, the REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations establishes mandatory rules which members must adhere to concerning compensation.  The REBNY Listing Service rules require a Seller Broker to equally share the commission established in the Listing Agreement with the Buyer Broker.  *See* RLS UNIVERSAL CO-BROKERAGE AGREEMENT RULES & REGULS., art. IV, §1).[6]  The relevant provision is as follows:

> With respect to the sale of an Exclusive Property, if a sale is consummated with a Buyer procured by a Co-Broker, unless the Exclusive Listing specifies otherwise or absent some other written agreement between an Owner and their Exclusive Broker(s), *the Exclusive Broker and the Co-Broker shall each be paid an equal share of the commission as specified in the Exclusive Listing*.

(Emphasis added).

---

[6]     Ex. A attached hereto at 14.

60.     REBNY brokers and agents must promise to abide by the REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations, including Article IV, Section 1 – Compensation. REBNY Listing Service require brokers and agents to agree in writing to adhere to REBNY Listing Service rules as demonstrated below:



**ACKNOWLEDGEMENT OF RLS UNIVERSAL CO-BROKERAGE AGREEMENT/RULES AND REGULATIONS**

Name of Firm:

Address:

Telephone:    (____)                          Fax:    (____)

E-Mail Address:

Broker A Member:

Policy Contact:                     Email

Listing Support Admin:                Email

Technical Contact:                  Email

Listing Technology Provider:    RealPlus ___    OLR ___    RealtyMX ___    BrokersNYC ___
                                RESoft ___    Perchwell ___    Leadkit ___

The undersigned represents that it: (i) is a duly licensed real estate broker under the laws of the State of New York; (ii) has received a copy of the RLS Universal Co-Brokerage Agreement/Rules and Regulations; and (iii) the execution of this acknowledgement has been duly authorized.

On behalf of my firm,_____, and all of its real estate brokers, associate real estate brokers and salespersons, we agree to abide by the terms and conditions set forth in the RLS Universal Co-Brokerage Agreement/Rules and Regulations.

Dated: _____

                          (Name of Residential Member of REBNY)

_____
By:
                          Name:
                          Title:

October 2021

61.     The inclusion of language concerning the commission to be paid by the Seller Broker to the Buyer Broker in the listing agreement, commonly known as the Buyers Broker Commission Rule, constitutes an antitrust violation under Section 1 of the Sherman Act and the

Donnelly Act (N.Y. Gen. Bus. Law §340) as there is no separate negotiation/competition concerning the commission paid to the Buyer Broker.

62.    REBNY Listing Service compensation rules require all REBNY listing agent members to agree to equally split a residential real estate commission with a Buyer Broker.

63.    The commission rate is typically negotiated between the Seller and the Seller Broker and is recorded in the listing agreement.  The listing agreement contains a provision that the Seller must compensate the Buyer's Broker.  Under the REBNY Listing Service rules, Sellers are required to pay for the residential real estate services of the Seller Broker as well as for the Buyer Broker.  Thus, REBNY Listing Service rules dictate that the Buyer Broker, who represents the Buyer's bests interests and typically seeks to negotiate/reduce the purchase price, is actually paid by the Seller, not the Buyer s/he represents.

64.    This counterintuitive compensation system generates "a lot of confusion around how commissions work" for Sellers.  Even real estate market analysts and journalists "never get[] a very clear cut answer from the industry or from anyone" on the subject.[7]  This inflexible commission practice has become so ingrained in the system that people have either accepted its unfairness out of deference to tradition or do not understand the nature and economic implications of the commission fee.

65.    As the Wall Street Journal has reported, residential real estate Sellers are effectively required to compensate their adversary's broker if they wish to sell their home, despite the obvious

---

[7]    *What's New in Residential Real Estate Brokerage Competition*, an FTC-DOJ Workshop, Segment 1 Tr. (June 5, 2018).

conflict of interest.[8]  As the Consumer Federation of America explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[9]

66.     In a fully competitive market, a Seller would pay a commission or fee to their own broker and the Buyer's Broker would separately be paid a negotiated commission. In such a situation, the Seller Broker's total commission would be less than the amount that Sellers have traditionally paid.

67.     The REBNY Listing Service's commission rule fosters an environment in which brokers *work co-operatively to split* a total commission instead of open and separate negotiation.[10]

68.     The anti-competitive nature of commission rule is clear when compared to other countries with competitive markets for residential real estate brokerage services.  Economists have compared international residential real estate commissions[11] with those in the United States and concluded:

---

[8]     Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, THE WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

[9]     *Id.*; *see also The Changing Real Estate Market: Hearing Before the Subcomm. on Hous. & Cmty. Opportunity of the Comm. on Fin. Servs.*, 109th Cong., vol. 4 at 73 (July 25, 2006).

[10]     In other litigation concerning the National Association of Realtors ("NAR") Buyer's Broker Commission Rule, the anti-competitive nature of this co-operative effort has been freely admitted by the broker-Defendants.  While NAR's rules state that co-operative compensation is required only when it is in the client's best interest, Defendants' position is that it is ***always*** in the client's best interest to market a property on a MLS.  On summary judgment, the court there established that ***all transactions*** facilitated by a MLS are cooperative transactions, and that there is no such thing as a non-cooperative transaction.  *See Sitzer v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00332-SRB, Order re: Defendants Summary Judgment Motions, ECF No. 1019 (W.D. Mo. Dec. 16, 2022).

[11]     *See generally* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Indus.*, 5 INT'L REAL ESTATE REVIEW (2002).

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . .  In the UK, the [total] commission rates average less than 2%. . . .  In New Zealand and South Africa, [total] commission rates average 3.14%.  In Singapore, the [total] commission rates also tend to run around 3%.[12]

69.    While these economists found variations within countries, all were much lower than are paid in Manhattan.  For example, in the United Kingdom, they found that "1% - 2% is typical" for **total** broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas even in the highest commission areas the range was "as high as 3.5%." Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[13]

70.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the Seller Broker and Buyer Broker) in Manhattan averages between 5% and 6%, with Buyer Broker commissions ranging between 2.5% and 3%.[14]  These numbers have remained stable despite both rising home prices (which lead to larger aggregate dollar commission amounts) and the decreasing role of the Buyer Broker in an age when many prospective home buyers have already scoured the market using online resources such as Zillow or other websites where properties are listed for sale.

71.    The Buyer Broker Commission Rule explains why commissions in Manhattan remain artificially and anti-competitively elevated.

---

[12]    *Id.* at 14.

[13]    *Id*. at 13.

[14]    Stephen Brobeck, *Diverse Real Estate Commissions: The New York City Residential Brokerage Anomaly*, CONSUMER FED'N OF AM., at 17 (Oct. 19, 2022), https://consumerfed.org/wp-content/uploads/2022/10/Diverse-Real-Estate-Commissions-Report-10-19-22.pdf.

72.     An analysis of foreign, domestic, and even other similarly situated New York real estate markets demonstrates that the absence of this rule would foster *a more competitive market*.

73.     For example, like many other areas of the United States to this day, southern and eastern Brooklyn residential real estate brokerage agencies, listing sites, and sellers historically used a listing service governed by National Association of Realtors ("NAR"). NAR regulations include, in effect, the same rule as REBNY that mandates the payment of commission by a Seller Broker to a Buyer Broker.

74.     In 2012, however, several Brooklyn brokerage firms broke away from NAR to form the Brooklyn Multiple Listing Service ("Brooklyn MLS") and established new rules and regulations, including a revocation of NAR's Buyer Broker Commission requirement.[15]  In doing so, Sellers now operate in a more competitive market that lacks supra-competitive Buyer Broker commission rules.

75.     The Brooklyn MLS **does not** require the Seller to make a blanket, unilateral, and non-negotiable offer of compensation to any Buyer's Broker whenever listing a home for sale. As a result, the Buyer Broker receives on average a lower commission than those in Manhattan. This is a substantial cost savings for Brooklyn residential real estate Sellers.[16]

76.     Recent data demonstrates the disparity in the median Buyer Broker commission rates spread across different geographic regions and MLSs within the greater New York City area. In a market unrestrained by the anti-competitive Buyer Broker commissions, the median Buyer

---

[15]     *Id.*

[16]     *Id*.

Broker's commission from homes listed on the Brooklyn MLS is a mere 1% while homes listed on the REBNY Listing Service had a median commission rate of approximately 3%.[17]

77.     The report concludes "[t]he NYC market shows that when listing agents are not required to offer non-negotiable commissions to buyer agents, rates decline" and "when these commissions are required, and listing agents must provide equal compensation to buyer agents, rates remain high."[18]  The report further concludes "[u]ncoupling rates would likely stimulate not only greater rate competition, but also needed experimentation with different rate and service models."[19]

78.     According to others, if Buyer Broker commission rules were eliminated, these services would become more competitively priced because Buyer Broker's commissions would be separately negotiated, paid by the Buyer or the Buyer would not use a Buyer Broker.[20]

## II.     MULTIPLE LISTING SERVICES

79.     A vast majority of residential real estate sales and purchases in the United States are facilitated through an MLS.  A MLS is a centralized database of properties which allows

---

[17]     *Brobeck*, *supra* n.14, Table 1 at 3.

[18]     Andrea V. Brambila*, NYC real estate commissions are all over the map: Consumer watchdog*, INMAN (Oct. 20, 2022), https://www.inman.com/2022/10/20/nyc-real-estate-commissions-are-all-over-the-map-consumer-watchdog/.

[19]     *Id.*; Tyler Williams, *"An Anomaly": What the Nation Can Learn From Realtor Commissions in NYC* (Oct. 31, 2022), https://www.citysignal.com/an-anomaly-what-the-nation-can-learn-from-realtor-commissions-in-nyc/.

[20]     Panle Jia Barwick & Maisy Wong, *Competition in the Real Estate Brokerage Industry: A Critical Review*, Cornell University and NBER (Nov. 20, 2019), https://barwick.economics.cornell.edu/Brookings_24PJB.pdf.

residential real estate brokers and agents to identify homes for sale within a defined region.  In 2020, 91% of homes sold in the U.S. were listed on an MLS.[21]

80.     Seller Brokers and Buyer Brokers use a MLS to publish or search for property listings.  Access to and membership in a MLS is essential for brokers in order to conduct residential real estate business.  A MLS provides a Seller the ability to efficiently broadcast and disseminate notice of a residential real estate property's listing for sale and provides a Buyer or their broker a means to research and discover residential real estate properties for sale in a particular area.  If a Seller Broker does not list a client's property on an MLS, most Buyers or Buyer Brokers will likely be unable to see or find that property.  A MLS also acts as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes.

## III.    CURRENT LITIGATION CONCERNING THE NAR'S BUYER BROKER COMMISSION RULE

81.     At least three class actions have been filed concerning NAR's Buyer Broker Commission Rule.  Like the REBNY Listing Service rule, the NAR Handbook and Code of Ethics require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on a MLS owned or controlled by a local NAR association.  If a buyer, represented by a Buyer's Broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the listing agreement.  This is described in the NAR Handbook Section 2-G-1 which provides, in relevant part, as follows:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to other MLS participants and shall

---

[21]     *Highlights From the Profile of Home Buyers and Sellers*, NAR (2022), https://www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers.

therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants . . . .

Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing broker to other participants to discuss terms and conditions of possible cooperative relationships.

82.     NAR Code of Ethics, Standard of Practice 16-15 provides that "In cooperative transactions REALTORS shall compensate cooperator REALTORS."  This Rule requires Sellers to offer compensation to the Buyer's Broker.

83.     NAR Code of Ethics, Standard of Practice 3-2 provides:

Any change in compensation offered for cooperative services must be communicated to the other REALTOR prior to the time that REALTOR submits an offer to purchase/lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.

84.     This rule serves to strengthen the Buyer Broker Commission Rule and inflate commissions through the elimination of negotiation of the Buyer Broker's Commission.

85.     Since 1996, NAR has repeatedly agreed and chosen to implement the Buyer Broker Commission Rule in the NAR Handbook even though this rule has faced significant criticism from economists and industry experts who express the Buyer Broker Commission Rule is anti-competitive and causes supracompetitive commission rates.

86.     As to the potential possibility that a Buyer might seek to reduce his or her Buyer Broker's commission by making that reduction a condition of a purchase offer, NAR has adopted another rule that prevents this.  Specifically, NAR's Code of Ethics, Standard Practice 16-16, states:

REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or

22

buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[22]

87.    In other words, a Buyer Broker presenting an offer to a Seller that is conditional on the Seller reducing the Buyer Broker's commission is an express violation of NAR's ethics rules.

88.    Failure to strictly comply with the Code of Ethics can lead to expulsion for NAR's individual and associational members.  NAR's Code of Ethics and Arbitration Manual states:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[23]

**A.    The Missouri Action**

89.    A class action suit against NAR and others was filed in 2019 in the Western District of Missouri alleging NAR rules violate the Sherman Act by inflating Sellers' transaction costs. *Sitzer v. Nat'l Ass'n of Realtors*, Civil Action No. 4:19-cv-00332 (W.D. Mo. 2019).  The motion to dismiss that case was denied on October 2, 2020.

90.    The class certification motion was granted in April of 2022.

91.    On December 16, 2022, the court denied the motions for summary judgment and trial commenced on October 16, 2023.

92.    In the month preceding the trial, Defendants RE/MAX and Anywhere reached a settlement with Plaintiffs for $55 million and $83.5 million, respectively.  Preliminary approval of the settlements remain pending.

---

[22]    National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2019), https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

[23]    National Association of Realtors, Code of Ethics and Arbitration Manual 2019 at 1, https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.

93.     After the conclusion of the trial, on October 31, 2023, the jury found that Defendants NAR, HomeServices of America, BHH Affiliates, HSF Affiliates, Keller Williams Realty, Anywhere Real Estate, and RE/MAX all voluntarily and knowingly conspired to enforce the NAR's Buyer Broker Commission Rule with the purpose of raising, inflating or stabilizing broker commissions.  The jury concluded this caused class plaintiffs to pay more for real estate brokerage services when selling their homes than they otherwise would have and awarded plaintiffs approximately $1.8 billion in damages.

**B.     The Illinois Action**

94.     On March 6, 2019, a class action was filed against NAR and the four largest national real estate broker franchisors: Realogy Holdings Corp., HomeServices of America, Inc., RE/MAX Holdings, Inc., and Keller Williams Realty, Inc., for allegedly conspiring to require home sellers to pay the broker representing the buyer of their homes, and to pay at an inflated amount, in violation of federal antitrust law.  *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768 (N.D. Ill. 2020).

95.     On March 29, 2023, the court granted class certification to the damages and injunctive relief classes.   The Seventh Circuit denied Defendants' request for permission to appeal the class certification ruling.

**C.     The Massachusetts Action**

96.     A class action lawsuit alleging that the owner of a real estate listing website owned by MLS Property Information Network, Inc., an association of realtors that operates the website "Pinergy," had conspired to artificially inflate the commissions paid to Buyer brokers in real estate sales through the adoption of the Buyer-Broker Commission Rule, which governed all listings on the Pinergy website.  *Nosalek v. MLS Prop. Info. Network, Inc.*, Civil Action No. 20-12244 (D. Mass. Oct. 3, 2022).

97.    On December 10, 2021, the court denied defendants' motion to dismiss the antitrust class action.  Upon information and belief, at least one defendant has settled and others are participating in mediation.  Plaintiffs' motion for class certification is due in the first half of 2024.

## SUBSEQUENT RULE CHANGES

98.    Only days ahead of the trial date in the *Sitzer/Burnett* matter pending in the Western District of Missouri, NAR announced a critical policy change with respect to its Buyer Broker Commission Rule, prospectively eliminating the requirement that a Seller Broker make an offer of compensation to a Buyer Broker.[24]  Previously, as discussed herein, like REBNY's rule, NAR's Buyer Broker Commission Rule required a Seller Broker to include a blanket offer of compensation to a Buyer Broker, typically an even split of 5%-6% of the sale price, when listing a property for sale on a NAR-affiliated MLS.  Now, a Seller Broker may include an offer of $0 commission when listing a property for sale.  Lead counsel for plaintiffs in the *Sitzer/Burnett* case called this sudden policy change a "stunning admission of guilt."[25]

99.    Similarly, REBNY Listing Service has recently announced changes to its Buyer Broker commission rule.  Effective January 1, 2024, REBNY Listing Service rules will require offers of compensation to a Buyer Broker to originate from the Sellers themselves – as opposed to a Seller Broker.[26]  As a result of this change, a Seller Broker will no longer be permitted to make an offer of compensation to a Buyer Broker, and a Seller Broker is precluded from paying a Buyer

---

[24]    Vanessa Bowman, *NAR Changes Its Stance and Allows Listings with $0 Buyer Commission*, BAM (Oct. 6, 2023), https://nowbam.com/nar-changes-its-stance-and-allows-listings-with-0-buyer-commission/#:~:text=The%20National%20Association%20of%20Realtors,affiliated%20MLSs%20across%20the%20U.S.

[25]    *Id.*

[26]    REBNY, *2024 UCBA Changes* (Oct. 10, 2023), https://www.rebny.com/articles/2024-ucba-changes/.

Broker's compensation.[27]  Now, according to REBNY Listing Service, the Buyer Broker "will be directly compensated by the seller or owner of the exclusive property."[28]

100.    REBNY Listing Service states the purpose of this change is "[t]o promote transparency and consumer confidence in the residential marketplace,"[29] of course, implying that the world that existed before the rule change was less transparent.   The anticipated impact of this change is telling.   One industry consultant foresees largely pro-competitive effects from this rule change: "[w]orst case scenario, the broker representing the buyer will have to negotiate their own fee with their client and the seller can no longer be compelled to make a blanket offer of compensation in order to list on the MLS."   Other likely effects include "more and more buyers going directly to the listing agent [Seller Broker]" or possibly a fundamental change in which Buyer Brokers "charge an hourly flat fee to represent buyers."[30]  Indeed, it has been reported that some real estate agents oppose the change because of its pro-competitive effects noting "it gives the buyers' agent too much leverage,"[31] and fear that the amendment "opens the door for buyer's agents to hold up deals to negotiate their commission with sellers."[32]

---

[27]      *Id*.

[28]      REBNY, *Decoupling Commissions FAQ* (Oct. 10, 2023), https://www.rebny.com/ articles/decoupling-commissions-faq/.

[29]      *Supra*, n.26.

[30]      Brooklee Han, *REBNY to require sellers to directly pay buyer's agent*, HOUSINGWIRE (Oct. 19, 2023), https://www.housingwire.com/articles/rebny-to-require-sellers-to-directly-pay-buyers-agent/.

[31]      TRD Staff, *Jury finds NAR, brokerages guilty in landmark commissions suit*, THE REAL DEAL (Oct. 31, 2023),  https://therealdeal.com/new-york/2023/10/19/adopts-new-buyers-agent-commission-rules/.

[32]      *Id*.

## RELEVANT MARKET AND DEFENDANTS' MARKET POWER

101.    The relevant market for the claims asserted herein is residential real estate services provided to residential real estate Sellers and Buyers by REBNY member residential real estate brokers and agents with REBNY Listing Service access.  Defendants' agreement to abide by the REBNY Listing Service Universal Co-Brokerage Agreement Rules and Regulations gives Defendants the ability to impose the Article IV Buyer Broker commission rule.  Access to the REBNY Listing Service is critical for brokers and agents to assist Seller and Buyers.

102.    The relevant geographic market for the claims asserted herein is Manhattan.  Nearly all residential real estate properties sold in Manhattan were listed on the REBNY Listing Service by brokers that are subject to /REBNY Listing Service.    Most Sellers prefer to work with a REBNY broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the Seller's property.  Likewise, most Buyers who seek to purchase Manhattan residential real estate typically prefer to work with a REBNY broker who has experience with and knowledge of the Manhattan residential real estate market.

103.    Defendants collectively provide the vast majority, if not the entirety, of Manhattan residential real estate broker services through the REBNY Listing Service.

104.    Any Seller Broker or Buyer Broker in the REBNY Listing Service area who wished to compete outside of Defendants' unlawful agreement would face significant barriers.

105.    A Seller Broker who represented a Seller without using the REBNY Listing Service would lose access to the large majority of potential Buyers, and a Buyer Broker who represented a Buyer without using the REBNY Listing Service would lose access to the large majority of Sellers.  Brokers cannot conduct business effectively without access to the REBNY Listing Service.

106.    For an alternative listing service to compete effectively with the REBNY Listing Service, without including REBNY Listing Service listings, would not have listings as comprehensive as the REBNY Listing Service.  Brokers and their individual agents who currently profit from inflated commissions and total commissions have minimal incentive to participate in an alternative listing service that would generate lower commissions and lower total commissions. Further, many Buyers would be reluctant to retain a Buyer Broker operating on an alternative listing service that required them to pay the Buyer Broker's commission, when other Buyer Brokers operating on the REBNY Listing Service are entirely compensated by Sellers. Accordingly, Seller Brokers on an alternative listing service would struggle to attract Buyer Brokers and their Buyer clients.

107.    Moreover, many residential real estate Sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient Buyers and Buyer Brokers.  Accordingly, a listing service attempting to compete with the REBNY Listing Service, without relisting its listed properties, would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent REBNY Listing Service.

## DEFENDANTS' CONTINUING VIOLATION

108.    During the four years preceding the filing of this Complaint, Defendants real estate brokerage firms, identified herein in paragraphs 19-44, repeatedly adhered to, required agents to comply with, and charged and/or received Buyer Broker's commissions and total commissions, in accordance with REBNY Listing Service rules that were inflated as a result of the unlawful agreement or conspiracy.  These inflated commissions during the preceding four years were paid by Plaintiff and the other Class members in connection with the sale of Manhattan residential real estate listed on the REBNY Listing Service.

109.    During the last four years, Defendants have continued to maintain, implement, and enforce REBNY Listing Service rules, including the Buyer Broker commission rule, in Manhattan.

## ANTI-COMPETITIVE EFFECTS

110.    Defendants' unlawful agreements and/or conspiracy has caused, and is causing, significant anti-competitive effects, which include, but are not limited to, the following:

- Manhattan Sellers have been forced to pay commissions to Buyer Brokers, who represent their adversaries in negotiations to sell their homes, thereby substantially increasing the Seller's transaction costs.

- Manhattan Sellers have been compelled to set a high Buyer Broker's commission to induce Buyer Brokers to show their homes to the Buyer Brokers' clients.

- Manhattan Sellers have paid inflated Buyer Broker commissions and inflated total commissions.

- The REBNY Listing Service commission rule has had the effect of fixing, raising, maintaining, or stabilizing artificially inflated Buyer Broker's commission rates.

- Price negotiation/competition among brokers by Manhattan residential real estate buyers and sellers has been restrained.

- The REBNY Listing Service Buyer Broker commission rule creates a system that rewards all Buyer Brokers similarly, despite their skill and services as a broker.

- Defendant brokerages have increased their profits substantially by receiving inflated Buyer Broker commissions and inflated total commissions.

- Defendants' unlawful agreements and/or conspiracy is anti-competitive, injurious to competition, and lacks any pro-competitive affects or justification.

111.    Even if Defendants raise any alleged pro-competitive effects, they are substantially outweighed by the unlawful agreements and/or conspiracy's anti-competitive effects.  Substantial economic evidence supports the view that Defendants' unlawful agreements and/or conspiracy has resulted in inflated total commissions and inflated Buyer Broker commissions paid by Sellers at levels far above what a competitive market would produce.

**ANTITRUST INJURY**

**CLASS ACTION ALLEGATIONS**

112.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of themselves and the following Class:

> All persons or entities that sold Manhattan residential real estate and paid a Buyer-Broker's commission in accordance with the Real Estate Board of New York Listing Service Universal Co-Brokerage Agreement Rules and Regulations since November 8, 2019 to present.

113.    Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families, the judicial staff, Plaintiff's counsel, and employees of their law firms.

114.    The Class is readily ascertainable because records of the relevant transactions exist.

115.    Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Defendants.

116.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

117.    There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

a.   whether Defendants entered into one or more unlawful agreements or a conspiracy, as alleged herein;

b.   whether the unlawful agreement(s) or conspiracy harmed competition, as alleged herein;

c.   whether the competitive harm from the unlawful agreement(s) or conspiracy substantially outweighs any competitive benefits;

d.   whether buyer broker commissions and total commissions were inflated as a result of the unlawful agreement(s) or conspiracy; and

e.   what are the appropriate class-wide measures of damages.

87.     Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent them and the Class.

88.     Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.SC. §1

90.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

91.     Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

92.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to: (i) require residential real estate sellers to pay artificially inflated Buyer Broker commissions and to eliminate competition; and (ii) preclude price competition for Buyer Broker commissions by agreeing to split commissions in listing agreements between the Seller Broker and the Buyer Broker.

93.     In furtherance of the contract, combination, or conspiracy, Defendants have committed one or more of the following overt acts: (i) participated in the establishment, implementation, and enforcement of the REBNY Listing Service Buyer Broker commission rule and other anti-competitive rules; (ii) participated in the establishment, implementation, and enforcement of rules by REBNY Listing Services that implemented the Buyer Broker commission rule in Manhattan; and (iii) included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of Defendants that required the implementation of and adherence to the REBNY Listing Service Buyer Broker commission rule in Manhattan.

32

94.     Defendants have required Sellers to pay an inflated Buyer Broker commission and/or inflated total commission, and have restrained Buyer Broker price competition/negotiation. This harm to competition substantially outweighs any competitive benefits.

95.     Defendants' unlawful agreements and/or conspiracy have caused Buyer Broker commissions and/or total commissions in Manhattan to be inflated.  Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on the REBNY Listing Service.

96.     Absent Defendants' unlawful agreement(s) or conspiracy, Plaintiff and the other Class members would have paid substantially lower commissions because the broker representing the Buyer would have been paid by the Buyer (and buyer-broker commissions would not be at supra-competitive levels).

97.     Defendants' unlawful agreement(s) and/or conspiracy constitute a *per se* violation of Section 1 of the Sherman Act because it fixes, raises, maintains and/or stabilizes residential real estate Buyer Broker commissions.  Alternatively, Defendants' agreements are unlawful under the Rule of Reason as the procompetitive benefits of their actions are outweighed by the anti-competitive effects.

98.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## COUNT II

### DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 16 OF THE CLAYTON ACT

99.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

100.     Plaintiff seeks declaratory and injunctive relief under federal antitrust laws.

101.     As set forth in Count 1, Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. §1.

102.     Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for residential real estate broker commissions than they would have paid in the absence of those violations.  These injuries will continue unless halted.

103.     Plaintiff and Class members, pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Section 1 of the Sherman Act.

104.     Plaintiff and Class members further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct the anti-competitive effects caused by Defendants' unlawful conduct and to restore competition in the residential real estate commission market.

## COUNT III

### VIOLATION OF THE DONNELLY ACT, NEW YORK GENERAL BUSINESS LAW §340

105.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

106.     Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of N.Y. Gen. Bus. §340.

107.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to: (i) require residential real estate Sellers to pay the Buyer Broker an artificially inflated commissions and to eliminate competition; and (ii) preclude

price competition for Buyer Broker commissions by agreeing to equally split commissions in listing agreements between the Seller Broker and the Buyer Broker.

108.    In furtherance of the contract, combination, or conspiracy, Defendants have committed one or more of the following overt acts: (i) participated in the establishment, implementation, and enforcement of the Buyer Broker Commission Rule and other anti-competitive rules; (ii) participated in the establishment, implementation, and enforcement of rules by REBNY Listing Services that implemented the Buyer Broker Commission Rule in Manhattan; and (iii) included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of Defendants that required the implementation of and adherence to the REBNY's Buyer Broker Commission Rule in Manhattan.

109.    Defendants have required Sellers to pay Buyer Brokers, to pay an inflated buyer-broker commission and an inflated total commission, and have restrained price competition among Buyer Brokers.  This harm to competition substantially outweighs any competitive benefits.

110.    Defendants' unlawful agreements and/or conspiracy have caused Buyer Broker commissions and total commissions in Manhattan to be inflated.  Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on the REBNY Listing Service.

111.    Absent Defendants' unlawful agreements or conspiracy, Plaintiff and the other Class members would have paid substantially lower commissions because the Buyer Broker would have been paid by the Buyer (and Buyer Broker commissions would not be at supra-competitive levels).

112.    Defendants' unlawful agreements and/or conspiracy constitute a *per se* violation of N.Y. Gen. Bus. §340 because it fixes, raises, maintains, and/or stabilizes Manhattan residential real estate commissions.

113.    As a direct and proximate result of Defendants' past and continuing violation of N.Y. Gen. Bus. §340, Plaintiff and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**COUNT IV**

**UNJUST ENRICHMENT**

114.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

115.    Plaintiff brings this action on behalf of the proposed Class.

116.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

117.    Defendants have reaped and retained substantially higher profits due to their unlawful agreements and scheme.

118.    Plaintiff and Class members have conferred and continue to confer an economic benefit upon Defendants in the form of profits resulting from the unlawful overcharges from residential real estate commission in connection with the Buyer Broker Commission Rule, as described herein, to the economic detriment of Plaintiff and Class members.

119.    Defendants' financial gain from their unlawful conduct is traceable to overpayments by Plaintiff and Class members for residential real estate broker commissions in connection with the Buyer Broker Commission Rule.

120.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from overpayments made

by Plaintiff and Class members for residential real estate broker commissions in connection with the Buyer Broker Commission Rule during the Class Period.

121.    The financial benefits the Defendants derived from overcharging Plaintiff and Class members is a direct and proximate result of Defendants' unlawful practices described herein.

122.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to the Plaintiff and Class members who paid, and continue to pay, artificially inflated broker commissions that inure to Defendants' benefit.

123.    It would be wrong and inequitable for Defendants to be permitted to retain any of the overcharges that Plaintiff and Class members paid, and continue to pay, as a result of Defendants' unlawful practices described herein.

124.    Defendants are aware of and appreciate the benefits that Plaintiff and Class members have bestowed upon them.

125.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of the Plaintiff and Class members.

126.    Plaintiff and Class members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Class members may make claims on a *pro rata* basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, pray for judgment against Defendants as to each and every claim made herein and for the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this

action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court enter an Order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.      That the Court award Plaintiff and the other Class members damages and/or restitution in an amount to be determined at trial;

D.      That the Court award Plaintiff and class members pre- and post-judgment interest;

E.      That the Court award Plaintiff and class members their costs of suit, including reasonable attorneys' fees and expenses;

F.      That the Court award Plaintiff and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing conduct determined to be unlawful; and

G.      That the Court award such other relief as it may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial of all issues so triable.

DATED: November 8, 2023            **MOTLEY RICE LLC**

 /s/  *Michael M. Buchman*
MICHAEL M. BUCHMAN
777 Third Avenue, 27th Floor
New York, NY 10017
Telephone: 212-577-0050
mbuchman@motleyrice.com

PATRICK COUGHLIN
CARMEN MEDICI (*pro hac vice* forthcoming)
JONATHAN SMALLWOOD (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
jsmallwood@scott-scott.com

PATRICK MCGAHAN
ISABELLA DE LISI
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
pmcghan@scott-scott.com
idelisi@scott-scott.com

*Counsel for Plaintiff Monty March*